IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-02324-WYD-MEH

XANTREX TECHNOLOGY INC., a Canadian corporation publicly traded on the Toronto
Stock Exchange,

      Plaintiff,

v.

ADVANCED ENERGY INDUSTRIES, INC., a Delaware corporation, and
CHRISTOPHER S. THOMPSON, an individual,

      Defendants.

---

## ORDER

---

THIS MATTER is before the Court following a hearing on January 18 and 21,
2008, on Plaintiff's Motion for Preliminary Injunction, filed November 5, 2007 (docket
#2); Defendants Advanced Energy Industries, Inc.'s and Christopher S. Thompson's
Motion to Dismiss, filed November 26, 2007 (docket # 26); and Defendants' Motion to
Dismiss First Amended Complaint and Jury Demand, filed January 8, 2008 (docket
#57).

For the reasons stated below Defendants' Motion to Dismiss is denied. The
Motion to Dismiss First Amended Complaint and Jury Demand is denied.  Plaintiff's
Motion for Preliminary Injunction is granted.

## I.    BACKGROUND

On January 7, 2008, Plaintiff filed its Amended Complaint wherein Plaintiff
asserts the following claims for relief: breach of contract against Thompson, violation of

the Colorado Trade Secrets Act C.R.S. § 7-74-101 against Defendants; tort of intentional interference with contract against Advanced Energy; common law conversion against Thompson and Advanced Energy; breach of fiduciary duty against Thompson; aiding and abetting breach of fiduciary duty against Advanced Energy; violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030 *et seq.* against Thompson and Advanced Energy. This case involves an area of technology within the growing field of renewable energy, called "solar inverters." Solar inverters are devices that convert DC power captured by solar panels into AC electrical energy that can then be provided directly to a customer or applied to a utility or electrical grid for general public consumption. *See* Transcript of Hearing, January 18 and 21, 2008, page 39, lines 1-8. (hereinafter "TR at _: _"). This case particularly focuses on what are known as "three-phase solar inverters." *Id.* at 40:16-17. Three-phase solar inverters are primarily used by commercial or industrial users on rooftops of businesses or in large solar field installations. *Id.* at 66:12-17. The solar inverter market itself, is a relatively new and emerging field with very high growth rates, and three-phase solar inverter products, in particular, have the highest growth rate within the overall market. *Id.* at 92:1-6.

Plaintiff Xantrex Technology, Inc. (hereinafter "Xantrex") is a publicly traded, Canadian corporation with its principal place of business located in Burnaby, British Columbia, Canada. Complt. ¶ 1. Xantrex has approximately 40 product families, one thousand separate products, and sells over one hundred thousand solar inverters. TR at 91:12-16; 154:21-24. Xantrex is the oldest North American manufacturer of solar inverters, having sold solar inverters world-wide for over ten years. *Id.* at 39:9-12.

About one-third of Xantrex's business is solar inverters, although it invests most of its resources, both funding and research, in that area. *Id.* at 39:13-20. Solar inverters are the fastest growing segment of Xantrex's business, growing at a rate of seventy to eighty percent year over year. *Id.* Xantrex sells both single-phase inverters as well as the three-phase inverters that are at issue in this litigation. Xantrex projects that within a few years, the solar inverter business will be its largest business segment. *Id.*

The parties agree that Xantrex's current market share with respect to three-phase solar inverters is approximately fifty-five percent in North America. *Id.* at p. 243: 24 - 244:1; *see also* Plaintiff's Hearing Exhibit 7 at AE001337. Xantrex estimates that its European market share is approximately twenty to thirty-five percent. TR at 41:1-3. Xantrex also sells solar inverters in all other major global markets including Japan, Asia-Pacific, Latin America, and Africa. TR at 40:1-7. There is no dispute among the parties that the competitive market for solar inverters is global and that the market has relatively few main players. *Id.* at 199:20-22. In fact, for the three-phase solar inverters, only two significant competitors exist in the North American market, and only three compete in Europe. *Id.* at 40:16-31.

Mr. Thompson has fifteen years of experience in the energy and power electronics industries. On January 28, 2005, Xantrex offered Mr. Thompson employment as its Vice President of Engineering and Product Development. Exhibit 2 to Declaration of John Wallace in Support of the Motion (the "Wallace Decl."). That offer contained a non-compete provision that was limited in geographic scope to "anywhere in North America." *Id.* at 4. Thompson did not accept that offer. The parties

renegotiated the terms of the compensation package. Thompson and Xantrex did not negotiate nor discuss the non-compete provision in the contract. Xantrex modified the non-compte provision making the scope of the non-compete global in nature. TR at 156:24-25; 157:1; See Ex 3 to Wallace Decl. Thompson accepted Xantrex's revised offer on February 4, 2005. Thompson commenced employment with Xantrex on March 17, 2005.

During Mr. Thompson's employment, Xantrex operated with a team-management approach directed by John Wallace, the Chief Executive Officer of Xantrex. TR at 41:5-12. The remainder of the team included the vice presidents in charge of operations, sales, marketing, human resources, and engineering and would meet every Monday morning (referred to as Top of the Week meetings or "TOWs") to discuss the overall management of the company. *Id.* Those meetings included detailed discussions concerning product development. *Id.* at 190:18-21. The meetings also involved discussions about customers, and particularly those that were having issues with Xantrex products or services. *Id.* These customers, referred to as "red-alert" customers, could be experiencing engineering issues or product performance issues relating to solar inverters, and the management team would discuss ways to assist with those customers, both on an engineering level and customer relations level. *Id.* at 191:12- 192:13.

According to Thompson, during his employment, he spent at least seventy percent of his time on solar products. *Id.* at 188:5-7. As a result, Mr. Thompson gained extensive knowledge of both engineering and product development in relation to

Xantrex's solar inverter business.  *Id.* at 187: 22 - 188:4.  At Xantrex, Mr. Thompson was responsible for teams who identified problems with products; for implementing, designing, and structuring processes; for learning customer requirements and preferences; and for knowing future plans and designs for solar inverters.  *See generally* TR at 42-43; 187:16 - 188:4.  Mr. Thompson also became familiar with the engineering of solar inverter products as a result of his role on the management team.  *Id.* at 209: 11-15.

Mr. Thompson's role at Xantrex exposed him to all of Xantrex's product development plans and processes.  Further, Mr. Thompson was the primary person responsible for the engineering of solar inverters.  *Id.* at 189: 8-14.  Mr. Thompson was therefore privy to the confidential information about why certain features were offered on Xantrex inverters and why others were not.  *Id.* at 196.  Much of this information came directly from Xantrex experience in the industry and confidential consultation with customers.  *Id.* at 44: 16-20.

Defendant Advanced Energy ("AE") is a Colorado corporation with its principal place of business in Fort Collins, Colorado.  AE is publically traded on NASDAQ, with a major emphasis on semiconductors and a technology called thin-film manufacturing.  In August 2007, AE announced that it was entering the North American solar inverter market with a three-phase solar inverter.  See Ex. 1 of Gomm Dec; TR at 149: 11-22.

Mr. Thompson testified that because of his wife's health issues, and in order to be closer to family, in spring of 2007, Thompson retained an executive placement firm and began looking for employment in the United States. TR at 150:24-25.  In July of

2007, Mr. Thompson first interviewed with AE for a position in its soon-to-be formed solar inverter division. TR at 157:1-8. At that time, AE had not publicly disclosed that it had or was developing a solar inverter product and Mr. Thompson initially did not know that AE was planning to launch a solar inverter product. *Id.* at 210: 16-24. Mr. Thompson admits that when he learned of AE's plans, the news was concerning to him as a then-current employee of Xantrex. *Id.* He did not disclose the existence of this new competitor or its product to Xantrex. *Id.* at 210-215.

At Mr. Thompson's second interview with AE, Mr. Thompson spent approximately five minutes reviewing the actual new AE product. *Id.* at 211: 3-22. Shortly after that second interview, Mr. Thompson put together a series of Microsoft Excel spreadsheets containing various analyses related to his potential employment with AE. *Id.* at 212-226; Ex. 3 to Gomm Dec. The first page of the document was market data, which Mr. Thompson testified, was available on the internet. *Id.* at 157:20-25. He shared this information with another AE employee. *Id.* at 158:22-160:2. Mr. Thompson testified that he did not share pages two and three with anyone at AE. *Id.* at 160:14-15.

Mr. Thompson sent an email to another Xantrex employee asking for Xantrex market data. *Id.* at 225-228. The Xantrex employee complied and provided the data. *Id.* Mr. Thompson testified that the data was being used for a proposal to the Department of Energy. *Id.* Mr. Thompson also requested the Xantrex "solar stats" from the same employee. *Id.* After receiving the information, Mr. Thompson requested a revision of that information. *Id.* Mr. Thompson created the first worksheet for AE the

same day he received the data from the other Xantrex employee. *Id.*

The second worksheet is entitled "Current Design Issues," and contains Mr. Thompson's observations from his five minute review of the AE product and his own personal brainstorming about the product. *Id.* at 211: 19; 214-216. This worksheet lists thirty-six individual issues that Mr. Thompson identified as worthy of question concerning the AE product. Mr. Thompson asserts that his noted concerns with the AE product were based on common engineering principles and common knowledge. *See Id.* at 212 - 231.

On July 27, 2007, Mr. Thompson accepted employment with AE as Vice-President and General Manager of Solar Inverters. TR 126:4. Mr. Thompson signed an "Employee Sign-on Bonus Reimbursement Agreement" with AE, and he did not disclose this fact to Xantrex. Further, Mr. Thompson testified that he believed he was only beginning the acceptance process by signing the document listed above. On that same day, Mr. Thompson submitted his resignation to Xantrex. Mr. Thompson testified at the time he resigned he did not notify anyone at Xantrex of his new position because he was waiting for the background checks at AE to clear. He told Xantrex that he did not yet have a job, and was considering moving back to a former employer whom Xantrex did not believe to be in the solar inverter business. *Id.* at 48-50. Mr. Thompson testified that his employment was contingent upon a successful background check and other pre-employment inquiries. *Id.* at 184:9-21; 185:12. I do not find Mr. Thompson's testimony on this issue to be credible. I find it concerning that Mr. Thompson deliberately deceived Xantrex about his future employer and remained at Xantrex.

Not knowing that Mr. Thompson was going to work for AE, Xantrex requested that Mr. Thompson remain at Xantrex for several weeks. During his final weeks at Xantrex, Mr. Thompson reviewed a series of Xantrex documents, including documents that housed various of Xantrex's trade secrets. Ex. 6 to Gomm Affidavit. These documents included (1) Xantrex's product road map which lays out the future business and product strategy of Xantrex and (2) documents used in Xantrex's engineering process for designing solar inverters. *Id.*; TR at 51-53.

Thompson testified that because of the noisy nature of the work environment, he would often download documents to his laptop in order to work in a conference room where he had more privacy or in order to work at home. TR at 129:1-22. Thompson testified that his downloading of these documents was consistent with that practice.

In Thompson's new position at AE as Vice President and General Manager of Solar Inverters at AE, he supervises marketing and sales of AE's solar inverter product development, including providing direct input on what features to offer in its products and what features should be revised. TR at 181-82. Mr. Thompson analyzes the solar inverter market and decides strategy for AE vis-á-vis its competition. *Id.* at 200 -03. For example, he participated in a decision by AE to focus development efforts on a 500 kilowatt product instead of a 167 kilowatt product, although prior to his joining AE, it had decided to focus on the 167 kilowatt product. *Id.* At the time he left Xantrex, it was in the process of developing a 500 kilowatt product and was considering what features to put into such product. *Id.* Mr. Thompson was privy to the decision-making process on the features that would be offered on that product. Finally, Mr. Thompson, on behalf of

AE, is now participating in sales calls to customers of solar inverters, including Xantrex's largest customer with whom he had previous business dealings, Sun Power. *Id.* at 205-06.

## II.     MOTION TO DISMISS

### A.     Standard of Review

Motions to dismiss based on forum selection clauses generally are analyzed as motions to dismiss for improper venue under FED. R. CIV. P. 12(b)(3). *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 956 (10th Cir. 1992), *cert. denied*, 506 U.S. 1021 (1992). The standard under 12(b)(3) is generally the same as a motion to dismiss for lack of personal jurisdiction. *See Johnson v. Northern States Power Co.*, 2000 WL 1683658 at *2 (D. Kan. 2000). In other words, the allegations in the complaint must be accepted as true if, as here, they are uncontested by affidavits. *See Behagen v. Amateur Basketball Assoc.*, 744 F.3d 731, 733 (10th Cir. 1984). To the extent the motion is asserted under 12(b)(6), the court "'must accept all the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff.'" *David v. City and County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996), *cert. denied*, 522 S.Ct. 858 (1997).

### B.     Merits of the Motion to Dismiss

Defendants assert that the forum selection clause in the employment agreement between Xantrex and Defendant Thompson requires the Court to dismiss this action because the employment agreement, which contains a forum selection clause, is the basis for all of the Plaintiff's claims. The Employment Contract (1) states that

Thompson is prohibited from competing with Xantrex for the period of one year following

his termination; (2) states that Thompson is prohibited from soliciting Xantrex's

customers or employees; (3) contains intellectual property assignment and protection;

and (4) imposes confidentiality and trade secret obligations on Thompson.

The forum selection clause at issue in this case states the following:

> The validity, construction and performance of this letter agreement will be
> governed exclusively by the laws of the Province of British Columbia and
> you and the Corporation irrevocably and exclusively attorn to the
> jurisdiction of the courts of British Columbia and agree that any
> proceeding brought in respect of this letter agreement will be brought in
> such of those courts as is appropriate.

Defs. Motion to Dismiss Ex. A.

1.      Mandatory vs Permissive

First, I will address whether the language of the forum selection clause is

mandatory as to Defendant Thompson.  I will later address whether the AE can enforce

the forum selection clause in Mr. Thompson's contract.  Defendants assert that the

language of the forum selection clause is mandatory; the clause does not grant the

parties the option of filing suit elsewhere.  The Defendants place particular emphasis on

the language of the agreement which states that " you and the Corporation **irrevocably**

and **exclusively** attorn to the jurisdiction of the courts of British Columbia **and agree**

**that any proceeding brought in respect of this letter agreement will be brought in**

**such of those courts as is appropriate."**  Defs. Motion to Dismiss at 5.

Forum selection clauses are prima facie valid and should be enforced unless

enforcement is shown by the resisting party to be unreasonable under the

circumstances.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972).  (internal

quotation omitted).  The Tenth Circuit and other courts have "frequently classified forum selection clauses as either mandatory or permissive." *Excell, Inc. V. Sterling Boiler & Mechanical, Inc.* 106 F.3d 318, 321 (10th Cir. 1997). "Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum." *Id.* (internal quotations omitted).  In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere. *Id.* (internal quotations omitted).

Where venue is specified in a forum selection clause with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified in a forum selection clause, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive. *K & V Scientific Co., Inc., v. Bayerische Motoren Werke Aktiengellschaft,* 314 F.3d 494, 499 (10th Cir. 2002).

Here, I find that the forum selection clause at issue is mandatory as to Defendant Thompson.  In particular, the language of the clause refers both to jurisdiction and venue in exclusive terms.  The relevant language of the forum selection clause ("irrevocably and exclusively attorn") is unambiguous and mandatory language.

The parties disagree about the scope of the forum selection clause.  Defendants assert that all of Plaintiff's claims against Defendants are subject to the forum selection clause because they are "brought in respect of" the employment agreement. Specifically, Defendants assert that Plaintiff's primary objective in this lawsuit is to enforce the non-compete and confidentiality provisions of the employment agreement.

Defendant asserts that the tort claims brought against the Defendants should fall within the forum selection clause of the contract as they are derivative of and intertwined with the employment agreement.

Plaintiff argues that Thompson's agreement does not provide that all claims relating in any way to his relationship with Xantrex must be brought in British Columbia. Instead, the forum selection clause is specifically limited to issues involving the contract itself. Further, because the central claims in this case (based on theft and use of trade secrets) are not brought "in respect to" Thompson's employment contract, they are not subject to the forum selection clause.

Plaintiff argues that certainly, Thompson breached his employment contract by stealing Xantrex's trade secrets and going to work for a direct competitor of Xantrex. In this sense, Thompson's breach is generally "related" to Advanced Energy obtaining and using Xantrex trade secrets. However, Plaintiff's claims for trade secret theft are independent of Thompson's contract or the alleged breach thereof.

"Whether tort claims are to be governed by forum selection provisions depends upon the intention of the parties reflected in the wording of particular clauses and the facts of each case." *Terra Inter., Inc. V. Mississippi Chemical Corp.*, 119 F.3d 688, 693 (quoting) *Barrett v. Life Ins. Co. of the Southwest*, 623 F. Supp. 946, 948-49 (D. Utah 1985). Non-contract claims that involve the same operative facts as a parallel breach of contract claim fall within the scope of a forum selection clause. *ADT Security Services, Inc., v. Apex Alarm, LLC*, 430 F. Supp.2d 1199 (D. Colo. 2006). See also *Lambert v. Kysar*, 983 F.2d 1110 (1st Cir. 1993)(Contract-related tort claims involving the same

operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties). "Pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms." *Crescent International, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943, 945 (3d Cir. 1988).

In this case, the forum selection clause, as worded, appears to apply only to proceedings brought in respect of the letter agreement itself. Again the language of the forum selection clause at issue states, " you and the Corporation **irrevocably** and **exclusively** attorn to the jurisdiction of the courts of British Columbia **and agree that any proceeding brought in respect of this letter agreement will be brought in such of those courts as is appropriate."** I find that the language of the forum selection clause is sufficiently narrow so that it only covers proceedings brought in respect of the letter agreement.

The first claim seeks recovery for breach of contract. The first cause of action is subject to the forum selection clause. Xantrex's first claim will certainly require the court to interpret the terms of the contract or "letter agreement" to determine whether Mr. Thompson breached the contract. Further, the breach of contract claim is brought in respect of the letter agreement.

As to Xantrex's claims for relief asserting violation of the Colorado Uniform Trade Secrets Act C.R.S. § 7-74-101 *et seq*, common law conversion, and violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030 *et seq*, I find that the forum selection clause applies to these causes of action as well. While these claims may not

necessarily be brought in respect of the letter agreement, I must examine the same

operative facts as the parallel breach of contract claim. *See ADT Security Services,*

*Inc.,* 430 F. Supp.2d 1199. Additionally, I find that the claims arise out of the contractual

relationship and implicate the contract terms. It is particularly telling that ¶91 of

Plaintiff's Amended Complaint references "Thompson's intentional violation of his

Employment Contract" when addressing the facts pertaining to the claimed violation of

Colorado Uniform Trade Secrets Act. Therefore, Xantrex's claims for relief asserting

violation of the Colorado Uniform Trade Secrets Act, common law conversion, and

violation of the Computer Fraud and Abuse Act fall within the scope of the forum

selection clause.

Xantrex's fifth claim for relief alleges Mr. Thompson breached his fiduciary duty

to Xantrex. The letter agreement states that

> You will hold in confidence, as the Corporation's fiduciary, and keep
> confidential during and after the term of your employment, all of the
> Secrets at any time known to you, unless and until such Secrets are
> generally available to the public through no breach of this letter
> agreement.

Letter Agreement attached as Ex. 1 to Motion to Dismiss. I find that this claim is clearly

brought in respect to the letter agreement because the very terms of the letter

agreement create an explicit duty for Thompson to act as the Corporation's fiduciary.

2.      Whether Advanced Energy May Enforce the Forum Selection Clause

Defendant AE asserts that it is entitled to enforce the forum selection clause

because its alleged liability is directly related to and completely derivative of

Thompson's liability. Plaintiff argues that Defendant AE, as a non-signatory third-party,

does not have standing to enforce the forum selection clause.

It is well established that " a range of transaction participants, parties, and non-parties, should benefit from and be subject to forum selection clauses." *Manetti-Farrow, Inc. v. Gucci America, Inc.* 858 F.2d 509 (9th Cir. 1988), citing *Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D.Ill.1984). In *Manetti- Farrow*, the plaintiff argued that the forum selection clause could only be applied to signatories of the contract. The Ninth Circuit rejected that argument and found that the forum selection clause could be applied to non-signatories of the contract where " the alleged conduct of the non-parties is *so closely related to the contractual relationship.*" *Id.* (emphasis added). See *also ADT Security Services, Inc.*, 430 F. Supp.2d 1199 (D. Colo. 2006). (Judge Babcock found that "a forum selection clause restricts a third-party beneficiary to the designated forum when the beneficiary could *reasonably have foreseen* its designation as the beneficiary to the contract). (emphasis added). See also *Graham Tech. Solutions v. Thinking Pictures, Inc.*, 949 F. Supp. 1427 (where non-signatory assignee was found to be closely related to contractual relationship between contracting parties the forum selection clause applied).

In each of the above cases where a non-signatory was able to enforce the forum selection clause, the court found that there was a close relationship to the contractual relationship. I find that no such relationship exists here because at the time of the signing of the contract on February 4, 2005, AE had absolutely no connection to the contractual relationship between Xantrex and Thompson. AE was not a third-party beneficiary that could reasonably have foreseen itself as a beneficiary to the contract.

Defendants ask me to apply the doctrine of equitable estoppel so that AE may enforce the forum selection clause. The use of equitable estoppel is within the court's discretion. *Bridas Sapic v. Government of Turkmenistan*, 345 F.3d 347, 360 (5th Cir. 2003). "Several courts of appeal have recognized an alternative estoppel theory requiring arbitration between signatory and nonsignatory." *Thompson-CSF, S.A., v. American Arbitration Assoc.* (5th Cir. 1995)(citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.* 10 F.3d 753, 757-58 (11th Cir. 1993), *cert denied*, 115 S. Ct. 190 (1994); *J.J. Ryan & Sons, Inc. v. Rhone Poulec Textile, S.A.*, 863 F.2d 315, 320-21 (4th Cir. 1988); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (7th Cir. 1984). "In these cases, a signatory was bound to arbitrate with a nonsignatory at the nonsignatory's insistence because of the 'close relationship between the entities involved,' as well as the obligations and duties in the contract...and [the fact that] the claims were 'intimately found in and intertwined with the underlying contract obligations.'" *Id.* (quoting *Sunkist*, 10 F.3d at 757).

Defendants contend that I should apply the doctrine of equitable estoppel as ordered in *GATX Management Serv., LLC v. Weakland*, 171 F. Supp. 2d 1159, 1165 (D. Colo. 2001). There, a former employee sued its former employee and his new employer, and sought a preliminary injunction for, among other things, alleged misappropriation of trade secrets. The court applied the equitable estoppel doctrine and permitted the new employer, who was not a party to the underlying employment, to assert and enforce the arbitration clause with respect to the claims plaintiff alleged against it.

The *GATX* case is distinguishable from the instant case. In *GATX* the employment agreement contained an arbitration clause which the court found to be broad – mandating arbitration for "any and all claims, demands, causes of action, disputes, controversies, and other matters in question arising out of or relating to this Agreement, any of its provisions, or the relationship between the parties created by this agreement." *Id.* at 1163. In contrast, as stated above, the scope of the forum selection clause in this case is narrow.

Defendant AE argues that Plaintiff's claims against AE rely on, reference, arise out of, or presume the existence of, the Employment Agreement. However, the fact that I may need to interpret the contract between Xantrex and Thompson in order to evaluate Xantrex's claims against AE does not trigger application of the forum selection clause to AE. *Berclain America Latina, S.A. de C.V., et. al, v. Bann Company N.V., et. al.*, 74 Cal. App. 4th 401 (Cal. Ct. App. 1999). (Discussing the mere fact that the contract will need to be construed and interpreted a certain way in order to evaluate a claim does not trigger the application of a forum selection clause to a party that was not closely related to contractual relationship).

Finally, I note that AE has not agreed to submit to the jurisdiction of the courts of British Columbia if I decided to apply the doctrine of equitable estoppel in this case. *See Bonny v. Society of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993)(enforcement of forum selection clause would be unreasonable if it would allow the defendant to escape suit because the English court could not gain jurisdiction over them). For the foregoing reasons, I find that AE is not entitled to enforce the forum selection clause against

Xantrex.

3.      Whether Enforcement of the Forum Selection Clause is Unreasonable

Plaintiff asserts that application of the forum selection clause in this case would

be unreasonable.  Specifically, Plaintiff argues that application of the forum selection

clause would be unreasonable because, while the breach of contract claim is only one

of the claims that Plaintiff alleges against Defendants, the rest of the claims arise under

Colorado or federal law.  As such, none of these claims could be litigated in British

Columbia.  In addition, Plaintiff asserts that it would be unreasonable to apply the forum

selection clause because this Court will still have to conduct a labor-intensive analysis

before a "foreign" non-compete could be enforced.

Forum selection clauses are *prima facie* valid and should be enforced unless

enforcement is shown by the resisting party to be unreasonable under the

circumstances.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972).  (internal

quotation omitted).   A forum selection clause may be considered unreasonable if: (1)

the incorporation of the forum selection clause into the agreement was the product of

fraud and overreaching; (2) the party seeking to escape enforcement "will for all

practical purposes be deprived his day in court" because of the grave inconvenience or

unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will

deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would

contravene a strong public policy of the forum state.  *Haynesworth v. Corporation*, 121

F.3d 956 (5th Cir. 1997). (internal citations omitted).  The party seeking to avoid

enforcement bears a heavy burden of proof.  *Id.  See also Riley v. Kingsley*

*Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir. 1992)("Only a showing of inconvenience so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice, would be sufficient to defeat a contractual forum selection clause.")

I will now address Plaintiff's argument that it may not be able to raise certain claims against Defendants in the Canadian courts.  Plaintiff by its own account is a major player in the global energy market.  Plaintiff by its own account, not only provided the document that later became the contract at issue in this case, but also negotiated many of the terms of the contract with Thompson.  Xantrex should have been well aware of the possibility that upon a possible breach of contract other countries may have more favorable laws regarding trade secrets and other matters arising out of commercial disputes.  Yet, Xantrex placed both a forum selection clause and choice of law provision in its contract.  The fact that Xantrex may not be able to bring some of its claims against Thompson and AE in British Columbia does not render enforcement of the forum selection clause unreasonable.  "The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement [of a forum selection clause], provided that the law of the chosen forum is not inherently unfair.  *Riley*, 969 F.2d at 958 (10th Cir. 1992).  Its seems inappropriate for Xantrex to argue that on one hand the contract and its provisions should be the basis for providing remedies under Colorado and federal law and on the other hand claim that the forum selection clause within that contract should be ignored by me.

As to Plaintiff's argument that the enforcement of the forum selection clause would contravene a strong public policy in Colorado regarding covenants not to compete, Plaintiff cites to *King v. PA Consulting Group*, 485 F.3d 577 (10th Cir. 2007), for the proposition that due to the public policy concerns involved in covenants not to compete, I will be required to analyze Thompson's non-compete agreement under Colorado law for it to be enforced. Plaintiff argues that because of Colorado's public policy considerations with respect to Colorado employees and non-competes, obtaining an injunction against Defendants in Canada would potentially be unenforceable and would place Xantrex right back where it is now. Xantrex's reliance on *King* is misplaced.

In *King*, an employee sued his employer, seeking a declaratory judgment voiding disputed non compete provisions in his contract and damages for violation of the Latham Act and tort law. The parties to the contract at issue in that case included a clause which stated that the parties agreed that the law of the state chosen by the parties would govern unless the application of the law of the chosen state would be contrary to a fundamental policy of the chosen state. The court concluded that Colorado had a materially greater interest in the covenant not to compete because the plaintiff was a resident of Colorado, his sole place of work was Colorado, he signed the contract in Colorado, and New Jersey's interests were tangential because the defendant was incorporated in New Jersey, but was headquartered in Washington D.C.

When determining whether the application of New Jersey law to the noncompete provisions would be contrary to a fundamental policy of Colorado, the court looked at

the noncompete policies of each state and examined whether the application of another state's law would violate Colorado's policy. The court then "compare[d] the dueling state-law regimes to determine whether they would reach opposing results. If they would not, Colorado's fundamental policy limiting noncompete agreements is not offended. *Id.* at 587.

Applying the *King* standard in this case, I first must examine whether the application of the laws of British Columbia would be contrary to a fundamental policy of Colorado. I must then look at the noncompete policies of British Columbia and Colorado and examine whether the application of British Columbia's law would violate Colorado's policy. Finally, I must compare both regimes and determine whether they would reach opposing results.

As to whether Colorado's fundamental policy limiting noncompete agreements is offended, the type of noncompete agreement at issue is within the exceptions to that policy as listed in C.R.S. 8-2-113 since it relates to a contract for the protection of trade secrets. Because, the contract fits within the exception to noncompete agreements, I will now compare the British Columbia and Colorado regimes to determine whether they would reach opposing results. In Colorado, there is a rule of reasonableness as to both duration and geographic scope of the covenant. *See Nat'l Graphics Co. v. Dilley*, 681 P.2d 546 (Colo. App. 1984); *Boulder Med. Center v. Moore*, 651 P.2d 464 (Colo. App. 1984). Covenants not to compete that are one year or even longer have been approved by the Colorado courts. *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App. 1988) (one-year noncompete clause); *In Re Marriage of Fischer*, 834 P.2d

270, 2783 (three-year noncompete clause); *Harrison v. Albright*, 577 P.2d 307 (1978) (five-year noncompete clause). This reasonableness standard also applies to a trade secret covenant, i.e., test for determining whether a covenant fits within the "trade secrets" exception is: (I) is the restrictive covenant justified at all in light of the facts; and (ii) are the specific terms reasonable. *Mgmt. Recruiters of Boulder v. Miller*, 762 P.2d 763 (Colo. App. 1988). Moreover, a trade secret provision in an employment agreement does not validate an unrelated restrictive covenant whose sole purpose is to prohibit all competition. *Colorado Accounting Machs., Inc. v. Merganthaler*, 609 P.2d 1125 (Colo. App. 1980); *Dresser Industries, Inc. v. Sandvick*, 732 F.2d 783 (10th Cir. 1984).

It is a long-standing principle of Canadian contract law that, *prima facie* all covenants in restraint of trade are illegal and therefore unenforceable. *Maguire v. Northland Drug Co.*, [1935] S.C.R. 412, 416 (S.C.C.)(emphasis in the original)(internal citations omitted). In British Columbia, an employer seeking to enforce a noncompete agreement has the heavy burden of demonstrating that: (a) the agreement protects a legitimate proprietary interest; (b) it is reasonable between the parties in terms of temporal length, spatial area covered, the nature of the activities covered, and overall fairness; (c) the terms of the agreement are clear, certain, and not vague; and (d) it is reasonable with reference to the public interest. *Valley First Financial Services Ltd. v. Trach* [2004] 30 B.C.L.R. (4th) 73 (B.C.C.A.). Under this standard, courts in British Columbia regularly strike down noncompete agreements that, as in this case, cover a large geographic or prohibit competition generally. *See, e.g., Canadian American*

*Financial Corp. v. King*, [1989] 60 D.L.R. (4th) 293 (B.C.C.A.) (holding that a covenant prohibiting competition against the employer in Canada and Bermuda was unreasonable and unenforceable); *Yellow Pages Group Co. V. Anderson* [2006 BCSC 518 (refusing to enforce noncompete that broadly prohibited competition with employer rather than proscribing specific uses of confidential information); *Napier Env. Tech Inc. v. Vitomir* [2002] BCSC 716 (holding noncompete with a worldwide scope was unreasonable, not in the public interest, and therefore unenforceable).

Comparing the laws of British Columbia and Colorado, I believe that the courts would reach similar results when examining the validity of the noncompete agreement. Both Colorado and British Columbia have a strong presumption against noncompete agreements. Both Colorado and British Columbia closely examine both the scope and duration of the noncompete agreement. Additionally, although the noncompete provisions in Defendant Thompson's contract effect his current employment in Colorado, arguably Canada has a materially greater interest in the covenant not to compete because Xantrex is a Canadian business, the contract was formed and signed in Canada, and the majority of the actions surrounding the carrying out of/or violation of the contract occurred in Canada. I find that the Plaintiff has not shown that it is necessary for a Colorado court to maintain jurisdiction nor apply Colorado law to protect any fundamental policy interest.

Plaintiff argues that because the litigation against AE will proceed in Colorado, dismissing Thompson will create duplicative litigation. Plaintiff asserts that separate litigation in Canada will create two dueling law suits which will result in waste of judicial

resources and time, as well as adding to the expense of litigation for all of the parties. Finally, Plaintiff argues that a second litigation in British Columbia will result in a decision that will force the parties to come back to Colorado for enforcement.

I find that pragmatic concerns weigh in favor of denying the motion to dismiss as to both Defendants. Requiring Plaintiff to litigate the claims against AE in this Court and then litigate the same facts under the same legal theories, would impose an onerous burden upon the Plaintiff. *See Nippon v. Fire Marine Ins. Co. v. M/V Spring Wave*, 92 F. Supp. 2d 574 (E.D. La. 2000)(finding that a forum selection clause was unreasonable in part because the movants would remain before the Court to litigate the same issues regardless of the disposition of the motion). See *also Cameron v. Group Voyagers, Inc.*, 308 F. Supp. 2d 1232, 1238 (D. Colo. 2004) (a forum selection clause "could be deemed unenforceable if it would result in the litigation of the same issues in different forums, risk depriving parties of their right to sue by operation of statues of limitations or other procedural bars to suit, or otherwise result in negative public policy ramifications from its enforcement). Additionally, I am concerned that litigating the case in two different forums could result in each reaching opposing results making enforcement of the preliminary injunction impracticable or impossible. For the foregoing reasons, Defendants' Motion to Dismiss is denied.

**III.     Motion for Preliminary Injunction**

A.     <u>Standard for Preliminary Injunction</u>

The primary purpose of a preliminary injunction is to preserve the status quo pending a final determination of the parties' rights. *Otero Savings and Loan Ass'n v.*

*Federal Reserve Bank of Kansas City, Mo.*, 665 F.2d 275 (10th Cir. 1981). "[T]he status quo is 'the last uncontested status between the parties which proceed the controversy until the outcome of the final hearing.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.* 269 F.3d 1149, 1155 (10th Cir. 2001) (quoting SCFC ILC, Inc., v. Visa USA, Inc., 936 F.2d 1096, 1100 n. 8). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' rights." *Id.*

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "'If the plaintiff can establish that the latter three requirements tip strongly in his favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'" *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

However, "when a preliminary injunction would alter the status quo, . . . the movant bears a heightened burden and 'must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'"

*General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d at 1226 (10th Cir. 2007).

(quotation omitted). Indeed, the movant must meet this heightened burden as to any of

the disfavored categories of preliminary injunctions, including injunctions that alter the

status quo, injunctions that are mandatory as opposed to prohibitory, or injunctions that

afford the movant substantially all of the relief he may recover at the conclusion of a full

trial on the merits. *O'Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 389

F.3d 973, 975 (10th Cir. 2004). As to those injunctions, courts must more closely

scrutinize the injunction "to assure that the exigencies of the case support the granting

of a remedy that is extraordinary even in the normal course." Movants seeking such an

injunction are not entitled to rely on the modified-likelihood-of-success-on-the-merits

standard. *Id.* at 976.

B.    Analysis of Preliminary Injunction Sought By Plaintiff

I first note that this is not the disfavored type of preliminary injunction, i.e., it

appears that it would not disturb the status quo. "[T]he status quo is 'the last

uncontested status between the parties which proceeded the controversy until the

outcome of the final hearing.'" *Dominion*, 269 F.3d at 1155. Xantrex's request that

Thompson be enjoined from disclosing Xantrex trade secrets to AE or anyone else, and

from working in the Inverter Technology and Charge Controller field at AE would return

Thompson to the status between the parties before Thompson allegedly breached his

employment agreement. Additionally, Xantrex's request that AE be enjoined from

employing Thompson in the Inverter Technology and Charge Controller field and from

using in any manner, any trade secret information regarding Xantrex that Thompson

may have provided to it also returns AE to the status quo before the controversy. Finally, Xantrex is not seeking mandatory relief nor is Xantrex seeking all of the relief demanded in its Complaint.

1.      Irreparable Harm

The Tenth Circuit has held that "when the evidence shows that the defendants engaged in, or about to be engaged in, the act or practices prohibited by a statue which provides for injunctive relief to prevent such violation, irreparable harm to the plaintiffs need not be shown." *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 629, 651-52 (10th Cir. 2004). Here, Xantrex brings at least one of its claims under the Colorado Uniform Trade Secrets Act ("CUTSA") C.R.S. § 7-74-101 et seq., which provides for such injunctive relief stating: "[t]emporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret." Therefore, a showing of irreparable harm is unnecessary in the instant case if plaintiff meets its burden as to the CUTSA claim.

Nonetheless, I will still discuss the standard for establishing irreparable harm. The Tenth Circuit has held that "'[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video*, 356 F.3d at 1260 (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (internal quotations omitted)).

Irreparable injury is established "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video*, 269 F.3d at 1156. The injury 'must be both certain and great,' . . . and . . . must not be 'merely serious or substantial.'" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quotation omitted). "Cases have also noted that irreparable harm is often suffered when 'the injury can[not] be adequately atoned for in money,' . . . or when 'the district court cannot remedy [the injury] following a final determination on the merits.'" *Id.* (quotation omitted). Additionally, one of the exceptions to the general rule that a monetary harm is not considered irreparable is where "the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits." *Hamlyn v. Rock Island County Metropolitan Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (potential for bankruptcy is injury sufficient for preliminary injunction); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2nd Cir. 1989) (same); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 356 (10th Cir. 1986) (threat to viability of business constitutes irreparable harm).

Here, I find that Xantrex has demonstrated both current irreparable injury as well as shown the substantial likelihood and threat of further immediate irreparable harm. I find that the value of the use of Xantrex information by AE is not directly compensable with monetary damages. I also find that Mr. Thompson occupies a near identical employment position as Vice President and General Manager of Solar Inverters to that

which he held while employed by Xantrex, in direct and overt violation of a valid non-completion agreement. "The difficulty of proving damages in non-competition clause cases has made injunctive relief the preferred remedy in Colorado." *Doubleclick Inc., v. Paikin*, 402 F. Supp. 2d 1251, 1260. AE has a directly competing product over which Mr. Thompson is in charge, and he is also in charge of developing competing products that will compete directly with Xantrex in the future. The result is that Xantrex will lose market share and customer business. Finally, I find that it appears difficult to calculate how the use of Xantrex information, especially engineering information, will contribute to future sales.

I also note that Defendants' arguments that no irreparable harm can be shown because AE was entering the marketplace already to be misplaced. It is immaterial whether AE was entering the market. The irreparable harm that I find to exist is that AE stands to gain, via Mr. Thompson, a head start into the marketplace based on Xantrex work, money, and trade secrets. *Telex Corp., v. IBM,* 510 F.2d 894, 929 (10th Cir. 1975).

I also do not find persuasive Defendants' argument that because Xantrex cannot point to a single lost customer, lost sale, or lost position in the marketplace, there is no harm. Simply because there is no current evidence that customers have been lost, or sales lost, does not mean that irreparable injury is lacking. *Dominion Video Satellite, Inc.*, 356 F.3d at 1260. (Because a showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the

issuance of an injunction will be considered.) As such, it is sufficient that the plaintiff has demonstrated that such loses are likely to occur. I find that Xantrex has presented sufficient evidence of irreparable harm.

2. Balancing the Hardships/Public Interest

The moving party must show that the harm it would sustain without an injunction outweighs the potential harm on an injunction to the alleged infringer. *Autoskill, Inc. v. Nat'l Education Support Systems, Inc.*, 994 F.3d 1476, 1498 (10th Cir.1993). The potential injury to an allegedly infringing party caused by an injunction merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement. *Id.* at 1498. Xantrex has the burden to demonstrate that the harm that it would sustain without an injunction outweighs the potential harm of an injunction against Thompson and AE.

I find that the balance of hardships tips in favor Xantrex. I find that the threat and harm posed to Xantrex as a result of its trade secrets, the core of its business strategies, marketing strategies and engineering information being in the hands of a direct competitor from improper means outweigh any possible harm to Defendants. Advanced Energy assets that "it will be hamstrung by injunctive relief which will effectively pull the plug on Advanced Energy's legitimate competition in the marketplace." I find little merit to Defendants' argument here. Advanced Energy claims that it intended to enter, and in fact entered, the solar inverter marketplace before Thompson commenced his employment here. If this is so, Advanced Energy should still be able to participate in the solar inverter marketplace while enjoined from employing

Thompson.  Further, I agree with Plaintiff that the public interest favors entry of an injunction because the public never benefits from trade secret misappropriation.  As stated above, a preliminary injunction does not stifle competition in the solar industry. AE is free to enter the marketplace without the use of Xantrex's trade secrets.

Defendants also assert that Mr. Thompson has uprooted his family and settled his children in new schools and that there are no power companies in Fort Collins where he could gain employment.  Again, I find little merit to Defendants' argument.  Mr. Thompson is a highly educated successful businessman and engineer.  He certainly appears capable of finding other employment either at AE or elsewhere.  As such, the balance of harms favor enjoining the Defendants.

    4.       Likelihood of Success on the Merits

        a.       Violation of the Colorado Uniform Trade Secrets Act C.R.S. § 7-74-101 et seq. Against Defendants Thompson and Advanced Energy

Xantrex asserts that Thompson has violated the Colorado Uniform Trade Secrets Act by using Xantrex information regarding its business models, marketing , and engineering specifications to formulate competitive AE plans while he was still employed at Xantrex.  Xantrex also asserts that just days before leaving Xantrex, Thompson accessed at least twenty-six highly confidential and trade secret competitive filed and either saved them to an external source or emailed them to his and his wife's personal email accounts.   Finally, Xantrex asserts that because Mr. Thompson is intimately familiar with Xantrex trade secrets and business plans and because he is in a near-identical position at AE, he will rely on or disclose the information he obtained at Xantrex.

According to the Colorado Uniform Trade Secrets Act, a trade secret is defined as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.  C.R.S. § 7-74-102(4).  "To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."  *Id.*  "What constitutes a trade secret is a question of fact for the trial court."  *Doubleclick*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005).

Factors relevant to determining whether a trade secret exists are:  (I) the extent to which the information is known outside the business; (ii) the extent to which it is known to those inside the business, i.e., by the employees; (iii) the precautions taken to guard the secrecy of the information; (iv) the savings effected and the value to the holder in having the information as against competitors; (v) the amount of effort or money expended in obtaining and developing the information; and (vi) the amount of time and expense it would take for others to acquire and duplicate the information. *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 847-48; *see also Colorado Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990).

 "A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competive advantage and is a

protectable secret." *Harvey Barnett, Inc. v. Shilder*, 338 F.3d 1125, 1129 (10th Cir. 2003).  In short, a trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Gold Messenger v. McGuay*, 987 P.2d 907, 011 (Colo. App. 1997).

Here, I find that Xantrex has presented enough evidence that the confidential information rises to the level of a trade secret as defined by the CUTSA and case law interpreting it.  The Xantrex information that Mr. Thompson accessed prior to leaving Xantrex relates to product development for solar inverters, including the benefits of various features of a new products, is a trade secret.  While some of the information about features may be available upon inspection, many of the reasons behind why a feature is offered is not available publicly.

Detailed customer information is a trade secret.  *Bradbury Co., Inc. v. Teissier-Ducros*, 413 F.Supp.2d 1209, 1222 (D. Kan. 2006).  Mr. Thompson, beyond having merely customer lists, had significant exposure to customer concerns and inside information about customer issues that would be useful to a competitor that did not know those concerns.  In this case, AE and Mr. Thompson are marketing competitive products to Xantrex current customer.  Xantrex's customer information is a trade secret. Additionally, Xantrex's business plans are a trade secret.  They are not known and the product development plans would be of use to a competitor.  All of these trade secrets enable Xantrex to compete in the solar inverter marketplace and maintain its competitive edge.

As Vice-President of Product Development and Engineering at Xantrex, Mr. Thompson clearly had access to, familiarly with, and direct specific knowledge of this Xantrex information. It is undisputed that Xantrex took reasonable measures in protecting against disclosure of the Xantrex trade secrets, having employees sign non-disclosure agreements such as the one Mr. Thompson signed, as well as housing important documents on a secure, user-access controlled server. Another factor commonly looked at is whether there existed an agreement between the employer and the former employee claiming misappropriation of trade secrets. *See Integrated Cash Management Services, Inc v. Digital Transactions, Inc.*, 732 F. Supp. 370 (S.D.N.Y. 1989). The existence of a nondisclosure agreement puts the employee on notice that the computer programs of an employer are considered trade secrets. *Id.*

"Misappropriation" of a trade secret means "(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (I) used improper means to acquire knowledge of the trade secret; or (II) At the time of disclosure or use, knew or had reason to know that his knowledge was. . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." C.R.S. § 7-74-102(2). "Improper means" includes "breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 7-74-102(1).

I note that the CUTSA provides for injunctive relief "to prevent or restrain actual or *threatened* misappropriation of a trade secret." C.R.S. 7-74-103 (Emphasis added).

Plaintiff argues that threatened disclosure may be shown by the inevitable disclosure of trade secrets. Further, Plaintiff argues that it is unlikely, if not impossible for, Mr. Thompson to segregate his mind and not use, rely upon, or disclose the Xantrex trade secrets that he possesses. Defendant asserts that the inevitable disclosure doctrine contravenes Colorado's public policy encouraging the mobility of employees and limiting covenants not to compete to the greatest extent possible. Defendant argues that the adoption of the inevitable disclosure doctrine would prohibit Thompson from working for a competitor and, AE would be prohibited from hiring a competitor's former employee, like Thompson, at any time in the future. Second, that the adoption of inevitable disclosure doctrine would run afoul of the CUTSA which permits injunctive relief only in cases of actual or threatened misappropriation of trade secrets.

I find that it is unnecessary for me to determine whether or not the Colorado legislature intended to recognize the inevitable disclosure doctrine. It is clear that the Colorado legislature intended to recognize something less than actual misappropriation of a trade secret as appropriate for injunctive relief within the framework of the statute. The real question here is whether the actions of the Defendants rise to the level of threatened misappropriation.

I was unable to find a Tenth Circuit or Colorado case that discusses what the Colorado legislature intended when using the term "threatened misappropriation." Other jurisdictions that have adopted some form of the Uniform Trade Secrets Act have addressed what constitutes "threatened misappropriation." *See Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1339 (S.D. Fla. 2001) (finding no

threatened misappropriation where the employee took no documents or confidential information with him when he left Del Monte, and there is no evidence that he made an effort to take such information and although he had thorough knowledge of the business, he could not remember the information with precision). *See also Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848, 856 (W.D. Mich. 2007), quoting *CMI Int'l Inc. Interment Int'l Corp.*, 649 N.W.2d 808 (Mich. App. 2002) ("Even assuming that the concept of 'threatened misappropriation' of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise the right of employees to change jobs.") Accordingly, I find that for a party to make a claim of threatened misappropriation, whether a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and competitor's employment of the party's former employee who has knowledge of trade secrets.

I find that Defendants' actions rise to the level of threatened misappropriation. Here, there is evidence that Mr. Thompson rapidly accessed Xantrex's trade secret documents just prior to leaving Xantrex. Further, there is evidence that Mr. Thompson, after viewing the AE product for several minutes, created from memory, "brain storming" documents for revising AE's product. While Defendants maintain that Mr. Thompson has not shared these documents with AE, it is the ready recollection of Xantrex's possible trade secrets in that situation which gives me pause when considering a threatened disclosure of Xantrex's trade secrets. This is of particular concern when Mr. Thompson is the point person for solar inverters at AE. Mr. Thompson does not have to transmit the information to anyone at AE for AE to use Xantrex's trade secrets. I find,

after carefully reviewing the record for circumstantial evidence of disclosure of this information and finding persuasive indicators that threatened disclosure exists, that there is a substantial likelihood of success on the merits on the CUTSA claims for relief or, at the very least, that questions going to the merits are so serious, substantial, difficult and doubtful as to make it ripe for litigation.

b.    Breach of Contract

Mr. Thompson is in violation of his non-compete provision in his employment agreement with Xantrex[1].  Xantrex and AE are direct competitors in the solar inverter market and it has been less than one year since Mr. Thompson left Xantrex.  The only question for me to decide is whether the clause is valid.  Plaintiff again asserts that because the non-compete clause has impact in Colorado and/or on Colorado residents, I should apply Colorado law.  Again, as stated above, that is not a correct recitation of the law since I concluded earlier in this Order that applying Canadian law would not lead to a result contrary to Colorado's fundamental policy or material interest.  Therefore, I must analyze the covenant not to compete under Canadian law.

The specific language of the non-compete clause reads:

If you cease to be employed by the Corporation for any reason, you will not, for a period of one year following the termination of your employment, in any manner, directly or indirectly, whatsoever
    (a) enter into, carry on, or be engaged in, connected with or interested in any competition with Xantrex's Business,
        (b) solicit or contact, for the purposes of solicitation, any person that

---

[1] The operable language from the employment agreement is as follows: "If you cease to be employed by the Corporation for any reason, you will not, for a period of one year following the termination of you employment, in any matter, directly or indirectly, whatsoever (a) enter into, carry on, or be engaged in, connected with or interest in any competition with Xantrex's Business."  Exhibit 3 to Wallace Dec. (Docket No. 8-4) at p.4

is a customer or active prospect of Xantrex at the date you cease to be an
employee for the purpose of selling or supplying, whether directly or
indirectly, any product or service that competes with and is similar to
Xantrex's Business,

(c) solicit or contact, for the purpose of solicitation, any employee of
Xantrex for employment or any other engagement.

Def. Motion to Dismiss Attached Ex. 1.

Restrictive covenants are *prima facie* invalid in Canada. Two leading cases on

the enforceability of restrictive covenants are *J.G. Collins Insurance Agencies v. Elsley*

(1978), [1978] 2 S.C.R. 916 (S.C.C.) , and *Canadian American Financial Corp.*

(*Canada) v. King*. *Napier Env. Tech. Inc. v. Vitomir* [2002] BCBS 716. In determining

that a clause is reasonable:

"1. The employer has the onus of establishing that the covenant is
reasonable; the employee has the onus of establishing that the covenant
is contrary to public policy;
2. Restrictive covenants in a contract of employment are scrutinized more
rigorously than restrictive covenants in an agreement for the sale of a
business;
3. A restrictive covenant that restricts competition generally, rather than
what is reasonably required for the protection of the employer, will
generally be unenforceable;
4. A restrictive covenant will only be enforceable if it is reasonable
between the parties and with reference to the public interest; and 5. Public
interest encourages free and open competition and discourages restraints
on trade.
*Id*.

Further:

. . . A covenant in restraint of trade is enforceable only if it is reasonable
between the parties and with reference to the public interest. As in many
of the cases which come before the courts, competing demands must be
weighed. There is an important public interest in discouraging restraints on
trade, and maintaining free and open competition unencumbered by the
fetters of restrictive covenants. On the other hand, the courts have been
disinclined to restrict the right to contract, particularly when that right has
been exercised by knowledgeable persons of equal bargaining power. In

assessing the opposing interests the word one finds repeated throughout
the cases is the word "reasonable." The test of reasonableness can be
applied, however, only in the peculiar circumstances of the particular case.
Circumstances are of infinite variety. Other cases may help in enunciating
broad general principles but are otherwise of little assistance.

*Id.* citing *Elsley*, 2 S.C.R.at 923.

For a "post-employment" restraint to be enforced, the Canadian courts have
required the parties seeking to uphold the restraint to prove that the restraint has the
following characteristics:(a) it protects a legitimate proprietary interest of the employer;
(b) the restraint is reasonable between the parties in terms of: (I) temporal length; (ii)
spatial area covered; (iii) nature of activities prohibited; and (iv) overall fairness; (c) the
terms of the restraint are clear, certain and not vague; and (d) the restraint is
reasonable in terms of the public interest with the onus on the party seeking to strike out
the restraint.  *KRG Insurance Brokers (Western) Inc. v. Shafron*, 2007 BCCA 79.

In the instant case, I find that under the laws of British Columbia the temporal
length, nature of activities prohibited, and the overall fairness of the covenant not to
compete are likely to be found reasonable.  However, I question as to whether the
spatial area of the non-complete clause is appropriate.  The non-compete in Mr.
Thompson's contract is global in nature.  Xantrex asserts that such a clause in
necessary due to the global nature of their business.  I find that it is unclear if such a
clause is overly broad under the laws of British Columbia.  *See, e.g., Canadian
American Financial Corp. v. King*, [1989] 60 D.L.R. (4th) 293 (B.C.C.A.) (holding that a
covenant prohibiting competition against the employer in Canada and Bermuda was
unreasonable and unenforceable); *Yellow Pages Group Co. v. Anderson* [2006 BCSC

518 (refusing to enforce noncompete that broadly prohibited competition with employer rather than proscribing specific uses of confidential information); *Napier Env. Tech Inc. v. Vitomir* [2002] BCSC 716 (holding noncompete with a worldwide scope was unreasonable, not in the public interest, and therefore unenforceable). But *see Ipsos S.A. v. Reid*, [2005] B.C.J. No. 1674 (holding that where there was no geographic restriction in the restrictive covenant, whether the covenants are too broad or too vague will require consideration of all of the evidence and that the issue could not be determined in the context of an injunction application).

Plaintiff contends that even if I find the worldwide scope overly broad, I may "read down" or apply the doctrine of notational severance to an overly broad geographic term to give effect to the parties' intentions. Defendants assert that it would improper for the Court to apply the "blue pencil" to a contract such as this one, limiting the geographic scope so that the non compete provision would be reasonable, because the term is completely absent in the contract.[2]  Defendants assert that absent geographic restrictions the non-compete agreement is void by operation of law.

Again, I find it unclear whether the courts of British Columbia would "read down" the geographic scope of the covenant to reflect the intentions of the parties.  After careful review of the law cited by the parties and upon my own independent research of British Columbian case law, I conclude that the issue of notational severance or the blue pencil rule is still an issue that has not been resolved by the courts.  *See KRG*

_____

[2] When a court applies the "blue pencil" test the court severs portions of the offending covenant and then enforces the modified contract.  *See King* [2002] BCBS 716.

*Insurance Brokers (Western) Inc. v. Shafron*, 2007 BCCA 79 (applying the doctrine of "notational severance" to a contract so that the reasonable construction of the terms of the contract reflect the intent of the parties). But *see Jordan v. Pacific Sign Group Inc.*, [2007] B.C.J. No. 865 ("I have considered, but rejected, the concept of 'reading down' as a means of giving effect to the restrictive covenant....To now attempt to impose more moderate restrictions would require me to rewrite, as opposed to interpret, the contract. This I cannot do.").

I find the reasoning in *KRG Insurance Brokers (Western) Inc.* to be persuasive. It is clear from the language of the contract that both parties at the time of contract intended to limit Mr. Thompson's direct competition with Xantrex in the field of solar invertors. Further, Mr. Thompson received consideration for accepting such a limitation. Additionally, Mr. Thompson is an educated engineer with considerable bargaining power. As such, I find that it is appropriate for me to apply the doctrine of notational severance to this agreement and reduce the global scope of Mr. Thompson's non-compete to North America so that the terms of the contract better reflect the intentions of both of the parties and what is just and equitable under the circumstances. Thus, by applying the law of British Columbia, Xantrex has a substantial likelihood of success in proving its breach of contract claim.[3]

---

[3] Additionally, I find that assuming, *arguendo*, that Colorado law applies, Plaintiff has a substantial likelihood of proving success on the merits. The covenant not to compete falls within two exceptions to Colorado's public policy against covenants not to compete. See 8-2-113(2)(b) and 2(d). Further, as to geographic scope, nation-wide restrictions have been held reasonable in geographic in scope. *Nutting v. Ram Southwest, Inc.*, 106 F. Supp. 2d at 1127 (D. Colo. 2000) (noting that no Colorado court has addressed the reasonableness of a worldwide scope, but in dicta, contemplating

c.     Breach of Fiduciary Duty

"[I]n order to establish a breach of a fiduciary duty arising from a confidential relationship, there must be proof, among other things, that (1) either the reposing of trust and confidence in the other party was justified, or the party in whom such confidence was reposed either invited, ostensibly accepted, or acquiesced in such trust; (2) the alleged trustee assumed a primary duty to represent the other party's interest in the subject of the transaction; (3) the nature and scope of the duty that arose by reason of the confidential relationship extended to the subject matter of the suit; and (4) that duty was violated, resulting in damage to the party reposing such confidence." *Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. Ct. App. 2002) (quoting *Jarnagin v. Busby, Inc.*, 867 P.2d 63, 67 (Colo. Ct. App.1993).)

I find that Xantrex has a likelihood of proving Mr. Thompson breached his duties owed to Xantrex as its Vice-President of Engineering and Product Development and as an Officer of its board of directors. First, while Mr. Thompson was still employed by Xantrex, he viewed a non-public competing product and did not disclose the fact to

that evidence that such a scope is required may allow for such a restriction). As to the lack of geographic limitation, even where a non-competition agreement does not contain a reasonable territorial restriction, the court has the authority to reform it under Colorado law. *Alexander & Alexander, Inc. v. Frank B. Hall & Co., Inc.*, 1990 WL 8028 (D. Colo. Jan. 31, 1990)(unpublished)(citing *Nat'l Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo. App. 1984). "The reasonableness of restraint in a restrictive covenant is determined on a case-by-base basis, taking into account the particular facts and circumstances surrounding the case and the subject covenant." *Electrical Dist., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1085 (10th Cir. 1999). (internal citations omitted).

Xantrex. Mr. Thompson then compiled spreadsheets of market analysis and critiques of the competing product. Then he was less than truthful in his discussions with Xantrex's CEO about his plans post-departure.

C.    Bond

I have "wide discretion" under Rule 65(c) in determining whether to require security for an injunction. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2002). A bond is unnecessary absent proof of a likelihood of harm to Defendants. *Id.* Because I find that Defendants will not suffer any harm as the result of the injunction, there is no need for a bond.

D.    Requested Injunction

Xantrex seeks to enjoin Mr. Thompson from working in his current capacity at AE as Vice-President and General Manager of Solar Inverters for a period of one year. It seeks to start the clock on this period from date of entry of an order. I find this to be reasonable in light of the one-year period in his employment agreement's non-competition clause. As stated above, the geographic scope of his employment agreement's non-competition clause shall be limited to North America. Xantrex also seeks to enjoin both Defendants from disclosing, disseminating, or otherwise using Xantrex trade secrets. This request is reasonable given Thompson's past employment with Xantrex and his agreement not to disclose, disseminate, or otherwise use Xantrex trade secrets at any time.


IV.    Conclusion

In conclusion, for the reasons stated herein, it is hereby

ORDERED that Defendants' Motion to Dismiss, filed November 26, 2007 (docket # 26) is **DENIED**. It is

FURTHER ORDERED that Defendants' Motion to Dismiss First Amended Complaint and Jury Demand, filed January 8, 2008 (docket #57) is **DENIED**.

FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction, filed November 5, 2007 (docket # 2) is **GRANTED**. The Injunction is as follows:

(1)     Mr. Thompson shall cease to work at Advanced Energy or with anyone in concert therewith in any capacity relating to or concerning the technology of solar inverters for a period of one year from date of entry of this Order;

(2)     Mr. Thompson shall be further enjoined from working with any North American based company, person, or other entity, either directly or indirectly engaged in the field of solar inverter technology for a period of one year from the date of entry of this Order; and

(3)     Mr. Thompson and Advanced Energy shall be enjoined from disclosing, disseminating or otherwise using any Xantrex trade secrets and must immediately destroy any copies thereof that are in their possession or control.

It is FURTHER ORDERED that no bond shall be required.


Dated:  May 23, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge